**10  CV   ' 446**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ECF case

-----------------------------------------------------------------x

CYNTHIA TROPP,

Index No.:

Plaintiff,

-against-

**COMPLAINT
AND JURY DEMAND**

CBS CORPORATION, FIRST UNUM LIFE
INSURANCE COMPANY, JOHN NESTOR,
MARLENE BAEZ, LINDA KALARCHIAN,
CHARLES BECKER, ANTHONY AMBROSIO
and JOHN DOES,

RECEIVED
JAN 19 2010
S.D.C. S.D.N.Y.
CASHIERS

Defendants.

-----------------------------------------------------------------x

## PRELIMINARY STATEMENT

1.    Plaintiff Cynthia Tropp brings this action for disability discrimination, hostile work

environment and retaliation pursuant to the New York State Human Rights Law, § 296(1) (a), *et seq.*

("SHRL") and the New York City Administrative Code, § 8-107(1) (a), *et seq.* ("CHRL").

2.    Plaintiff brings this action for violations of the Employee Retirement Income Security Act,

29 U.S.C. § 1100, *et seq.* ("ERISA").

3.    Plaintiff also brings this action for violations of the Family Medical Leave Act, 29

U.S.C.S. § 2601, *et seq.* ("FMLA").

## JURISDICTION

4.    Jurisdiction is conferred upon the Court by 28 U.S.C. §§ 1331, 1343 and 1367.

5.    Venue lies in the Southern District of New York because the unlawful actions complained of

and the records relevant to such practices are maintained and administered within this district.

1

## PARTIES

6.     Plaintiff Cynthia Tropp ("Plaintiff" or "Mrs. Tropp") is a resident of New Jersey and, at all relevant times, has suffered from several muscular-skeletal disabilities, including severe injuries and impairments to her lumbar region and neck.

7.     At all relevant times, Plaintiff has also suffered from high-blood pressure and fibromyalgia.

8.     These disabilities have required Plaintiff to undergo extensive surgery and ongoing rehabilitative treatment.

9.     In addition, in October, 2007, while Plaintiff was employed with Defendants, Plaintiff severely injured her right shoulder when the commuter bus she was riding in was involved in a collision.

10.     Mrs. Tropp's disabilities means that she has medical impairments which prevent the exercise of her normal bodily functions, such as walking, running, driving, lifting/carrying objects and sitting for extended periods of time.

11.     Accordingly, at all relevant times, Mrs. Tropp was and remains disabled as that term is understood under the SHRL and the CHRL, had a record of being disabled and/or was perceived by Defendants as being disabled.

12.     Defendant CBS Corporation ("CBS"), a private corporation with headquarters at 51 West 52nd Street, New York, New York 10019, is a television and mass media company based in New York City.

13.     Defendant John Nestor ("Nestor") is the Telecommunications Department Operations Manager at CBS and was Mrs. Tropp's manager and direct supervisor during much of her employment. As such, Nestor directly controlled Mrs. Tropp's employment and was personally responsible for many of the discriminatory, harassing and retaliatory acts asserted herein.

2

14.     Defendant Marlene Baez ("Baez"), the Director of Human Resources at CBS, was personally responsible for many of the unlawful acts alleged herein and aided and abetted Nestor's discriminatory conduct.

15.     Defendant Linda Kalarchian ("Kalarchian") is the Vice President of Human Resources at CBS and was personally responsible for some of the unlawful acts alleged herein.

16.     Defendant First Unum Life Insurance Company ("UNUM") is an insurance company with headquarters at 1200 Colonial Life Blvd, Columbia, SC 29230 and is, amongst other things, CBS's disability program administrator.

17.     CBS offers ERISA-controlled plans to its eligible employees affording, amongst other things, long-term disability insurance ("the LTD plan"), short-term disability insurance ("the STD plan"), and health insurance ("the Health Plan").

18.     UNUM is the underwriter and claims administrator for CBS's LTD, STD and Health Plans.

19.     "CBS's Retirement Committee" is a body composed largely of CBS employees and managers that oversees the management and implementation of CBS's ERISA-controlled LTD, STD and Health Plans, of which Baez and Kalarchian are both members.

20.     Defendant Anthony Ambrosio ("Ambrosio"), CBS's Executive Vice President, and Defendant Charles Becker ("Becker"), CBS's Senior Vice President, are also members of CBS's Retirement Committee.

21.     Upon information and belief, CBS's Retirement Committee and all the named Defendants were collectively the "plan administrators" for CBS's LTD, STD and Health Plans and thus liable to Plaintiff for the ERISA-violations asserted herein.

## STATEMENT OF FACTS

22.     Defendants hired Plaintiff as a Telecom Voice Analyst in May 2004.

3

23.     As a benefit of her employment, Plaintiff became enrolled in CBS's STD, LTD and Health Plans.

24.     Mrs. Tropp was responsible for managing CBS's and its related affiliates' telecommunication needs for day to day operations and also special projects.

25.     Plaintiff's work included performing complex software installations, coordinating and supervising circuit orders and inventories and other advanced telecommunications work.

26.     Plaintiff was responsible for overseeing and coordinating technicians in the setup and installation of telephone, voicemail and video conferencing equipment and generating work orders to the on-site technicians.

27.     Mrs. Tropp also approved and signed off on bills and invoices for completed work.

28.     At this time, Tom Leavens, CBS's Telecommunications Department Operations Manager ("Leavens"), directly supervised Plaintiff.

29.     In August, 2005, due to her demonstrated expertise, Mrs. Tropp was also assigned responsibility for installing the telecommunications network and equipment for CBS's Blackrock Building on 51 West 52nd Street, housing CBS's highest level executives, including Les Moonves.

30.     Plaintiff was chiefly responsible for this large-scale project that cost over $29 million, which she performed successfully, and she supervised five technicians during the project.

31.     Mrs. Tropp's performance appraisals for April 2004-April 2005 and April 2006-April 2007 indicated that she met and/or exceeded Defendant's legitimate job performance expectations.

32.     As described below, however, as part of the retaliation she suffered, Mrs. Tropp did not receive a performance appraisal for the period April 2005-April 2006.

33.     On November 9, 2004, Mrs. Tropp was placed on FMLA/short-term disability leave due to extreme back pain and symptoms related to her fibromyalgia.

34.     Mrs. Tropp provided Defendant Baez, CBS's Senior Director of HR, with medical documentation from her neurologist and pain management physician, Dr. Mark Lazar M.D., providing reasons for her leave.

35.     During her leave, Rhonda Rospide, in Viacom's HR Department, which shared some oversight over CBS's HR functions, advised Plaintiff that she was not to go into detail with her direct manager, Leavens, about the reasons for her disability but that she was just to remind Leavens of her physical limitations.

36.     Ms. Rospide said it was HR's responsibility to handle the details of Plaintiff's disability with her manager so that "nothing could be held" against her.

37.     Plaintiff returned to work on December 22, 2004, with unequivocal written instructions from her doctor not to lift heavy objects and to avoid sitting or standing uninterrupted for long periods of time.

38.     Plaintiff provided Baez with a medical note detailing the foregoing medical restrictions.

39.     Plaintiff also emailed a copy of her physician's note to Leavens also indicating that she had fibromyalgia.

40.     In January, 2005, despite the medical restrictions imposed by Plaintiff's doctor, Leavens instructed Mrs. Tropp to do heavy manual work at CBS's disaster recovery site, a warehouse facility in Secaucus, New Jersey.

41.     The work at the site required Mrs. Tropp to organize and pack heavy equipment into boxes and stack them so they could be moved to another location.

42.     Mrs. Tropp's job description did not, nor has it at any time, required that she perform heavy lifting and packing; at most, Plaintiff should have been required to merely supervise and oversee technicians in their performance of such work.

5

43.    Moreover, Plaintiff's able-bodied co-workers were not asked to perform this work.

44.    Plaintiff reminded Leavens of the medical restrictions imposed by her doctor that she should not lift heavy objects and requested that she be provided with manual assistance for the project.

45.    Plaintiff also told Leavens that driving to Secaucus would be difficult and painful.

46.    Leavens replied that Plaintiff had no choice but to complete the Secaucus project without any assistance, adding, "Cindy, you need to give 100% and nothing less."

47.    Leavens then claimed that he did not know about Plaintiff's disabilities.

48.    Plaintiff reminded Leavens that she had just emailed him a copy of a medical note from her doctor.

49.    After this discussion with Leavens, Baez called Mrs. Tropp into her office and told Plaintiff that going to Secaucus was part of her responsibilities and that she had to get the work done.

50.    Plaintiff told Baez she risked serious injury if she were to perform the job in Secaucus.

51.    Baez replied that Mrs. Tropp was "hired to do her job at 100% capacity" and that if Plaintiff did not go to Secaucus and complete the project they would "have a problem," implying that Plaintiff's job would be in jeopardy.

52.    Mrs. Tropp went to Secaucus and completed the project without assistance and in great pain between January 2005 and March, 2005.

53.    Meanwhile, in February 2005, Defendant Nestor replaced Leavens as Mrs. Tropp's manager and direct supervisor.

54.    Nestor continued to insist that Plaintiff drive to Secaucus and complete the project over Plaintiff's objections.

55.    Nestor had already received a copy of Plaintiff's medical documentation and therefore was well aware of her medical and physical restrictions.

6

56.     As a result of performing the Secaucus project, Plaintiff exacerbated her back injuries and developed new disc herniations.

57.     These injuries – which were medically documented in a series of MRI scans soon after completing the Secaucus project - required Plaintiff to undergo two back surgeries and to take additional medical leaves to recuperate.

58.     These injuries would have been avoided had Leavens, Baez and Nestor complied with Plaintiff's doctor's orders and either provided Mrs. Tropp with manual assistance at the Secaucus site or assigned the project to one of her co-workers.

59.     On March 7, 2005, Mrs. Tropp was placed on FMLA-protected medical leave due to her back disability and pain caused by fibroids.

60.     When Mrs. Tropp returned to work in June 2005, Nestor was dismissive towards Plaintiff and expressed his annoyance at her taking medical leave.

61.     For example, as soon as Mrs. Tropp reported to work, Nestor called her into his office and told her "hopefully from this point on you will have no medical restrictions for work and we can go on from here."

62.     At this time, Mrs. Tropp handed Nestor a note from her physician, Dr. Friedman, dated June 8, 2005, that stated she was not to perform any "heavy lifting, carrying or standing for long periods of time."

63.     Nestor read the medical note and stated he would put the note in Plaintiff's personnel file.

64.     Despite knowing of Plaintiff's disabilities and her doctor's orders, Nestor continued to assign Plaintiff projects that required extensive walking, standing or bending for long periods of time.

65.     Nestor was dismissive of Plaintiff's disabilities and medical restrictions and began to exhibit hostile behavior towards Plaintiff and no one else in her group.

66.     Nestor would frequently point his finger in Plaintiff's face and speak to her very slowly as if Plaintiff was hard of hearing or developmentally challenged, even in front of her co-workers, causing her embarrassment and humiliation.

67.     Nestor would talk down to Plaintiff in staff and vendor meetings in a condescending tone and he would prevent the reimbursement of Plaintiff's business expenses by failing to provide Plaintiff's reimbursement forms to accounts payable.

68.     Nestor would also assign Plaintiff projects at the last minute but would often refuse to provide information necessary to start them such as contact names and phone numbers or refuse to provide Plaintiff with budget codes for projects he assigned her.

69.     Budget codes are a very important part of CBS's record keeping and project billing process.

70.     When Plaintiff requested the information necessary to complete the project, Nestor would become irritable and hostile.

71.     During this time, Plaintiff was taking oral painkillers and receiving injections of pain relieving medication into her back that required frequent visits to her doctor.

72.     This pain relieving treatment included twice monthly trigger point injections and monthly epidural injections.

73.     Nestor showed resentment towards Plaintiff whenever she requested time off to attend a doctor's appointment and he would either ignore her request or place onerous and unreasonable demands on her that made it difficult for her to leave work.

74.     For example, on various occasions, when Mrs. Tropp requested permission to leave work early to attend a doctor's appointment, Nestor would claim that Plaintiff needed to ask Baez for FMLA-approved leave.

75.     This was despite the fact that Plaintiff would compensate for leaving early by either coming

into work early that day or using her accrued personal or vacation time.

76.     Mrs. Tropp received her annual performance review in June 2005 prepared by Leavens for the year 2004.

77.     In her review, Mrs. Tropp was unfairly downgraded in a number of areas which resulted in her receiving a lesser salary increase than her co-workers.

78.     On July 19, 2005, and because of Leavens and Nestor's mistreatment, Mrs. Tropp filed an internal complaint with "CBS Openline," under the subject of "Retaliation" where she complained about her downgraded review, lesser raise and the harassment she was suffering.

79.     CBS's Openline is a system whereby employees can lodge workplace complaints via email.

80.     Under CBS's Non-Discrimination and Anti-Harassment policy, CBS is obliged to investigate every complaint by an employee and promptly produce a written decision.

81.     In breach of this policy, however, CBS did not investigate or even acknowledge receiving Plaintiff's July 19 complaint.

82.     Meanwhile, Nestor continued to treat Plaintiff with hostility, such as denying Plaintiff "comp time" for hours worked over her standard hours and ignoring her requests for standard office supplies, such as ink cartridges for her printer.

83.     Plaintiff's co-workers were not harassed in this way, were paid their "comp time" without delay and were provided office supplies without incident.

84.     On many occasions, Nestor and Baez feigned ignorance of Mrs. Tropp's disabilities and medical restrictions, falsely claiming that there was no medical documentation to support her restrictions or that the documentation sent by her doctor's did not go into enough detail.

85.     On August 25, 2005, and given Nestor and Baez's false claim that Mrs. Tropp's disabilities and medical restrictions were not documented, Mrs. Tropp was forced to obtain another medical note

9

from her doctor, Dr. Mark Friedman M.D., stating that she could work only with the following restrictions: "no standing for more than 1 hr per day; no bending for more than half an hour per day; no carrying; no lifting."

86.    Dr. Friedman's office sent two medical notes to Baez regarding the foregoing medical restrictions.

87.    After receiving Dr. Friedman's notes, Baez claimed to Mrs. Tropp that her doctor's medical notes did not establish that she had a disability.

88.    On the other hand, however, Baez claimed that the doctor's notes *did* indicate that Mrs. Tropp could not perform the duties required by her position.

89.    Plaintiff told Baez that, on the contrary, she was able to do her work as long as CBS provided her with the reasonable accommodations requested by Dr. Friedman and reminded Baez that approximately 90% of her work should have involved desk work.

90.    Moreover, according to her work description, Plaintiff was only supposed to oversee and supervise technicians in the installation and set up of equipment and the performance of inventories, leaving any extensive physical work to them.

91.    In fact, Plaintiff's co-workers were allowed to rely upon onsite technicians to perform these inventories and other physically taxing work.

92.    Nevertheless, Nestor typically targeted Plaintiff for physically demanding work despite the availability of non-disabled and/or male peers who could easily have performed such work.

93.    For example, Nestor periodically required Plaintiff to do a physical inventories of telephone equipment.

94.    To avoid standing and stretching for long periods of time, Plaintiff requested the help of a technician to perform these inventories, yet Nestor refused to provide Plaintiff with assistance, even

10

threatening her job on more than one occasion stating, "This is your responsibility, and if you don't do this physical inventory, that's it."

95.     In at least one email to Nestor, Plaintiff reiterated that she would be in severe pain were she to complete the inventory and that it contravened her doctor's instructions, but to no avail.

96.     Plaintiff performed the inventories in great pain for fear of losing her job, spending several hours standing and bending, lifting and moving heavy objects such as desks, file cabinets, book cases and television stands to access phone jacks.

97.     Plaintiff was required to use a walking cane when performing these inventories.

98.     This physically taxing work exacerbated Plaintiff's back problem and worsened her disc herniation as revealed from an MRI scan.

99.     Upon information and belief, Nestor required Plaintiff to perform unnecessary and time consuming inventories to harass and retaliate against her for her having lodged complaints with HR against him.

100.    Then starting in September, 2005, Plaintiff started to receive harassing phone calls at home from Nestor in the evenings and during the weekends.

101.    Plaintiff knew it was Nestor who was calling as his name appeared on her caller ID.

102.    During one incident, Nestor called Mrs. Tropp's home repeatedly and hung up when Mrs. Tropp's husband answered.

103.    On one occasion, when Mrs. Tropp did return Nestor's call, he cursed and yelled at her and then Plaintiff heard the sound of his phone being thrown.

104.    On September 20, 2005, Plaintiff filed another internal complaint with "CBS Openline" under the subject of "Harassment at Home" in which she complained of Nestor's harassing phone calls and also his mistreatment generally.

105. Again, in breach of its own policy, CBS did not investigate or respond to Plaintiff's serious allegations.

106. Upon information and belief, Nestor was not even reprimanded for making harassing calls to Plaintiff's home.

107. Meanwhile, Nestor increased his harassment by denying Mrs. Tropp reimbursement for her necessary business expenses, which prompted Mrs. Tropp to file another complaint on September 21, 2005.

108. Also, on September 23, 2005, Plaintiff emailed Betty Panarella ("Panarella"), the Vice President of Viacom Employee Relations, to complain about Nestor continuing to force her to perform the strenuous physical work against her doctor's strict orders.

109. In that September 23 email, Plaintiff wrote that she could "complete her work as long as John [Nestor] shows some sensitivity for my condition and does not ask me to do things that will be physically difficult based on my doctors restrictions. This includes his continued demand that I spend a long period of time on my feet doing a walk through of the Executive Floor with him. Additionally he needs to keep himself in check and not call my home in the evening unnecessarily."

110. Plaintiff also provided Panarella with a copy of an August 25, 2005 medical note from her doctor detailing her medical restrictions and disabilities.

111. After receiving this August 25 note and Plaintiff's email, on September 27, 2005, Plaintiff was called into a meeting with Panarella.

112. Panarella stated to Plaintiff that given her doctor's August 25 medical note, she was not able to perform her job at a "100% capacity" and that Defendants could not accommodate Plaintiff's medical restrictions.

113. Panarella claimed that for Plaintiff to be able to work at CBS she had to be 100% capable of

12

doing "everything."

114.    Plaintiff responded by asking, "So you do not acknowledge anyone who has a bona fide disability?" and reminded Panarella that her job should not have involved any heaving lifting, excessive lifting or bending.

115.    Plaintiff also complained that none of her co-workers had been forced by Nestor to perform arduous physical inventories off-site and that her co-workers all relied upon the onsite technicians to perform these inventories.

116.    Panarella reiterated that Plaintiff was not allowed to work unless she was working at a 100% capacity without medical restrictions and that she was to stop working as soon as she finished the executive project, due on October 3rd, 2005.

117.    Panarella then gave Plaintiff information about filing a workers' compensation claim and told her to discuss this with her doctor.

118.    Following this meeting, Panarella sent an internal memo to Plaintiff, dated September 28, 2005, stating that "Marlene Baez is handling your employee relations issues."

119.    Panarella also wrote that "[a]t this time Cynthia, I find your complaints to be employee relations matters not Compliance related illegal behavior." This despite the fact that Mrs. Tropp had been obviously complaining about unlawful harassment and discrimination.

120.    In fact, neither Panarella nor Baez investigated Mrs. Tropp's complaints of workplace harassment and retaliation despite being required to under CBS's policies.

121.    On October 4, 2005, Mrs. Tropp was placed on FMLA-leave due to her ongoing back problems and the severe stress caused by Nestor's harassment and CBS's utter refusal to remediate.

122.    On October 25, 2005, Plaintiff underwent a lumbar microdisectomy, the first of two lumbar surgeries, for injuries and pain caused when Defendants forced her to do the heavy lifting in Secaucus

in January-March, 2005.

123.    On March 1, 2006, Mrs. Tropp had follow-up surgery on her lumbar region.

124.    Had Defendants not forced Plaintiff to complete the project in Secaucus and other physically demanding work, Plaintiff would not have required these surgeries.

125.    Plaintiff returned to work on April 3rd, 2006.

126.    Upon returning to work, Nestor continued to treat Plaintiff with hostility and took adverse action against her because she had taken disability leave.

127.    For example, in April 2006, Nestor told Mrs. Tropp that she would not be receiving a performance pay increase because she had been on disability leave for "most of 2005."

128.    Nestor also refused to provide Plaintiff with a performance review and cancelled Plaintiff's OCTEL certification training, which she was scheduled to receive prior to her disability leave.

129.    Also, Nestor continued to require that Mrs. Tropp attend lengthy meetings where he forced her to remain standing for up to two hours at a time in pain.

130.    Nestor would even ask Plaintiff why she turned red during these meetings, to which she would explain that she was in extreme pain due to her back.

131.    Had Mrs. Tropp not taken FMLA-protected leave and had she not been disabled, she would not have suffered these reprisals.

132.    Between September-December 2006, Nestor assigned Plaintiff responsibility for CBS's telephone line conversion project, a physically demanding project that involved lots of lifting and bending over that caused Mrs. Tropp much back pain.

133.    Nestor's harassment and Plaintiff's inability to prevent it caused her blood pressure to rise to dangerous levels.

134.    On November 30, 2006, Mrs. Tropp was rushed to Brunswick Urgent Care and treated for

extremely high blood pressure that was measured at 240/180.

135.    In February 2007, Mrs. Tropp made another internal complaint about Nestor to Defendants Baez and Kalarchian, yet they refused to meet with her to discuss the complaint.

136.    In February 2007, while in Nestor's office, and without provocation, Mrs. Tropp was punched in the lower back by an outside contractor, Tom Healey.

137.    Healey knew that Plaintiff had recently undergone back surgery.

138.    Nestor, who witnessed the assault, did not react to this outrageous behavior and continued the meeting as if nothing had happened.

139.    Mrs. Tropp left Nestor's office in great pain.

140.    A co-worker, Lisa Barona, looked at Plaintiff's back and confirmed that there was a big bruise where Healey had punched her.

141.    Subsequently, about one hour and half later, Healey went to Plaintiff's cubicle, gave her a sloppy kiss on her left cheek, and said "Sorry Darl ... I thought you were tough!"

142.    In response, Plaintiff said that it was inappropriate and disrespectful to punch her in the back and asked Healey whether he would treat his wife like that.

143.    Healey then walked to the adjacent cubicle where Ingvar Kaasler worked and said about Mrs. Tropp: "She's a crazy bitch that cunt!" while looking directly at Plaintiff.

144.    On February 13, 2007, Mrs. Tropp emailed a complaint to Nestor about Healey's assault.

145.    Nestor promised to speak to Healey but otherwise never mentioned anything to Mrs. Tropp about the incident.

146.    Mrs. Tropp filed a complaint with CBS's Openline about Healey's assault but, again in breach of their own policies, CBS did not investigate or even respond to the complaint.

147.    In March, 2007, Plaintiff attempted to reach the head of her department, Amy Berkowitz, CBS's Chief Information Officer of Information Technology, to discuss Nestor's harassment and retaliation.

148.    Plaintiff left a message with Ms. Berkowitz's assistant but was not called back.

149.    In March, 2007, Nestor unreasonably refused to provide Plaintiff with important training for new "VOIP" equipment purchased and installed at CBS, again ostensibly because she had taken FMLA leave.

150.    Being trained in the VOIP equipment installed throughout CBS was important to Plaintiff's job function.

151.    Plaintiff's co-workers, including Lisa Barona and Ingvar Kaasler, were personally trained by Nestor in the VOIP system in 2007 and in 2008 received additional formal training from the vendor.

152.    In March, 2007, Plaintiff had a conversation with Baez about the assault and Nestor's failure to take action against Healey.

153.    Mrs. Tropp also complained to Baez that Ingvar Kaasler, a close friend of Nestor's, had used Mrs. Tropp's personal code to input a bogus work order that was billed in Plaintiff's name.

154.    Submitting a bogus work order using Plaintiff's personal code – a serious violation - could have resulted in Plaintiff's immediate discharge and, upon information and belief, Kaasler did so with that aim in mind.

155.    Finally, Mrs. Tropp complained to Baez that Nestor had falsely blamed her for failing to put through a teleconference call for CBS's upper executives with vendors.

156.    These executives, including Sumner Redstone and Les Moonves, were angry at Nestor that he was not at work at 7.30 AM when the particular conference call was scheduled.

157.    Plaintiff was at work already at 6.30 AM, however, and initiated the teleconference call without incident in Nestor's absence.

158.    Despite this, Nestor attempted to deflect blame onto Plaintiff for his absence during the teleconference call.

159.    Baez advised Plaintiff to meet with Nestor's bosses, Marc Zito, Defendants' Director of Telecommunications and Data Networking, and Reynold "Ren" Burke, Defendant's Director of Telecommunications.

160.    Plaintiff requested a meeting with both, but only Ren Burke met with her.

161.    On March 16, 2007, Mrs. Tropp met with Mr. Burke and complained to him about Nestor's harassment, the bogus work order submitted using her access code and Healey's assault.

162.    Burke promised that he would issue a memo to the outside vendors, including Healey, reminding them that physical assaults were not tolerated on CBS's premises.

163.    When Plaintiff asked Burke whether he would do anything to prevent Nestor's harassment and retaliation against her, Burke threatened Plaintiff's job by stating: "I need my job. I assume you need yours?"

164.    Predictably, this meeting with Burke neither ended Nestor's harassment nor was the bogus work order voided.

165.    Thus, on March 27, 2007, Mrs. Tropp felt compelled to file another internal complaint with CBS's "Openline" under the subject of "Need help" in which she documented the ongoing harassment, the denial of training in the new VOIP technology that her co-workers enjoyed and CBS's refusal to take corrective action.

166.    Again, CBS did not even acknowledge receiving this urgent complaint from Plaintiff.

167.    Meanwhile, Plaintiff's emotional state deteriorated because of the workplace stress and her

desperation about CBS's refusal to take action, and in March 2007 she was prescribed anti-anxiety medications.

168.    Around this time, and due to Baez and HR's refusal to take any action, Mrs. Tropp asked Baez to direct her discrimination complaints to Ms. Berkowitz, the head of Plaintiff's department.

169.    Baez ignored this request, however.

170.    On April 2, 2007, Mrs. Tropp went out on FMLA-protected disability leave for stress and due to her back and neck disabilities.

171.    On September 18, 2007, Mrs. Tropp returned to work under sedentary work restrictions ordered by her physician, Michael A. Palmer, M.D., including "no lifting greater than 10lbs."

172.    Plaintiff provided copies of that medical note to Nestor and Baez.

173.    The day that Plaintiff returned to work, Nestor called Plaintiff into his office and handed her performance review for April 2006-April, 2007, in which he had downgraded her unfairly in numerous aspects.

174.    In that appraisal, Nestor unfairly and falsely criticized Plaintiff, amongst other things, for her lack of communication skills and for her failure to "handle issues promptly," which criticism related to the prior earnings communication call for which Nestor had been found fully to blame as he was not at work when the call was initiated.

175.    Throughout this meeting, Nestor was also very hostile towards Plaintiff.

176.    On October 1, 2007, Mrs. Tropp was in an accident while a passenger on a commuter bus, in which she sustained serious injuries to her right shoulder, a torn labrum.

177.    Prior to this date, Mrs. Tropp had not suffered any injuries or pain to her right shoulder.

178.    Plaintiff took just two days off from work to recover.

179.    Upon returning to work, Baez met with Mrs. Tropp and falsely claimed that Dr. Palmer told

her that Plaintiff was not under any sedentary work restrictions despite the September 18, 2007 from Dr. Palmer indicating otherwise.

180.    Mrs. Tropp immediately called Dr. Palmer who denied ever having spoken to Baez or anyone at CBS about Plaintiff's medical conditions.

181.    Nevertheless, Baez told Mrs. Tropp to re-submit her September 18, 2007 medical note from Dr. Palmer.

182.    On October 9, 2007, Mrs. Tropp filed an internal complaint with "CBS Openline" in which she detailed the continuing mistreatment.

183.    In that October 9, 2007 complaint, Plaintiff wrote: "I need to speak with someone outside of IS&T about some issues I have been experiencing here. I came back from a disability leave and things are worse than ever. I am feeling that I am being pushed out because I made a complaint about a breech [sic] in company policy. I am trying to get back into my workflow, but my manager is taking a hard edge approach and I feel its only going to get worst [sic]. No matter when I report a problem there is some sort of retaliation I have to face here. I like working for CBS Corporation, but my experience here have been very trying. Can I please speak to someone outside of my department?"

184.    Days after this October 9 complaint, and in retaliation, Nestor ordered Mrs. Tropp to walk from the CBS's offices at 555 West 57th Street to its Blackrock building at 51 West 52nd Street, a distance of approximately 1 and a half miles, to do yet another inventory of equipment.

185.    Nestor was well aware of Plaintiff's doctor orders that she only perform sedentary work and not lift anything.

186.    For fear of losing her job, Plaintiff did what she was she told and performed the equipment inventory in pain as she had to lift and carry equipment.

187.    Nestor did not offer Mrs. Tropp the option of taking a cab to this location, even though other

19

employees frequently took cabs when traveling between CBS's locations.

188.   Subsequently, Mrs. Tropp discovered that performing the equipment inventory was not necessary as Frank "Chuck" Auer, a technician who was onsite at the Blackrock building, could have easily performed the inventory himself.

189.   On October 18, 2007, Kalarchian and Baez finally agreed to meet with Plaintiff to discuss the harassment and retaliation.

190.   This was only the second time that CBS's HR Department had met with Plaintiff to address her numerous and increasingly urgent complaints.

191.   At this meeting, Mrs. Tropp described the serious incidents of retaliation, including the assault and threats of physical violence, the continual flouting of her medical restrictions, Nestor's harassing calls to her home and the severe hostility that she had been suffering for over two years.

192.   Just two business days after this meeting, Defendant Kalarchian wrote to Plaintiff claiming she had conducted an investigation and that "we did not find evidence that John [Nestor] has yelled at you, insulted you, created a hostile work environment for you."

193.   The investigation by Kalarchian and Defendants was obviously cursory as CBS could neither have looked into every complaint and allegation leveled against Nestor over the previous two years in such a short time, nor have interviewed the necessary witnesses.

194.   In November, 2007, Mrs. Tropp began to suffer severe shoulder pain and rotator cuff tendonitis due to the October 2007 commuter bus accident.

195.   Mrs. Tropp was told by her physician that she required surgery for these additional injuries.

196.   This shoulder injury was a new disability, separate and distinct from her previous back and neck disabilities for which Plaintiff had already taken leave.

197.   In November and December, 2007, Plaintiff advised both Nestor and Baez that she was to

20

undergo surgery on her shoulder on January 11, 2008, and was to return to work at the end of

January, 2008.

198.    On December 20, 2007, despite knowing of Plaintiff's deteriorating physical condition and

impending surgery, Nestor assigned Plaintiff yet another physically demanding project involving

bending, lifting and carrying.

199.    This project was originally assigned to Ingvar Kaasler but Nestor assigned Plaintiff to the task

as further harassment.

200.    At this time, it would have been obvious to Nestor that Plaintiff was in pain as she was

breaking out in hives on her face and neck.

201.    Plaintiff performed the project unassisted.

202.    Mrs. Tropp took vacation leave on the 26th, 27th & 28th of December, 2007, because of her

shoulder pain.

203.    Mrs. Tropp sent an email to Nestor on December 30, 2007, informing him that she would be

absent from work the following week due to her shoulder injury.

204.    On January 7, 2008, Mrs. Tropp sent Baez by email a copy of a medical note from her doctor,

Jeffrey S. Abrams, M.D., dated December 27, 2007, outlining her physical disabilities that included

disorders of bursae and tendons in shoulder region, osteoarthrosis localized secondary involving

shoulder region and a superior glenoid labrum lesion.

205.    Plaintiff reminded Baez that she had been under medical care since December 20, 2007 due to

the deteriorating condition of her arm and shoulder and that this necessitated additional medical leave.

206.    Baez's only response was by email sent on January 7th 2008 to ask Plaintiff if she had

contacted UNUM and applied for disability ("I understand that you have been out since December

26th, can you let me know if you have contacted UNUM to apply for disability.")

207.    Notably, Baez did not warn Plaintiff at this time that she risked her job if she went on
disability leave.

208.    On January 7th, 2008, Mrs. Tropp's doctor placed her on disability leave to await surgery
scheduled for February 5, 2008.

209.    Meanwhile, because Mrs. Tropp's most recent disability leave was necessitated by a shoulder
injury that was new and unrelated to her previous disabilities, UNUM approved Plaintiff to receive an
additional 26 weeks of STD disability payments pursuant to CBS's STD plan.

210.    CBS's STD plan provides that: "If your disability recurs after you have been back to work for
45 days or more **or is due to another cause,** you start a *new* 8 calendar day elimination period and 26
week maximum period payment." (Emphasis added).

211.    Then, without warning, by letter, dated January 15, 2008, Defendant Baez advised Mrs. Tropp
that CBS had terminated her employment.

212.    In that letter, Baez claimed Plaintiff was not entitled to be reinstated to her position because
she had been absent from work for a cumulative period of time exceeding six months in a single 12
month period beginning December 26th, 2007.

213.    When Defendants terminated Plaintiff's employment, they were well aware that UNUM had
already approved Plaintiff to receive renewed STD benefits starting on January 7, 2008 based on
medical documentation.

214.    On January 15, 2008, Mrs. Tropp immediately reminded Baez by email that her current
disability leave was for new shoulder injuries unrelated to her previous disability, that UNUM had
approved her for STD benefits based on these new injuries and that her job should have been
protected according to CBS's policy.

215.    Defendants refused to reinstate Plaintiff, however.

216.   On January 18, 2008, CBS stopped paying Mrs. Tropp's salary and terminated her medical coverage under Health Plan at a time when Plaintiff most needed medical benefits and just before she was about to undergo serious surgery.

217.   Mrs. Tropp was shocked and extremely upset to be discharged from her employment after four years of service.

218.   From the time that Plaintiff was absent from work on December 27th, 2007, until she was terminated, only 18 days later, Plaintiff kept CBS and Nestor personally informed of her status on a daily basis.

219.   Yet, at no time prior to being placed on disability leave was Plaintiff given any indication that her employment would be terminated if she opted to take such leave.

220.   Moreover, Defendants failed to engage in an interactive process with a view to accommodating Plaintiff's disabilities and allowing her to remain employed at CBS.

221.   Such reasonable accommodations could have taken the form of allowing Plaintiff to work from home, which was a privilege routinely given to Plaintiff's co-workers and managers.

222.   For example, Marc Zito was allowed to work remotely from home in September, 2007, while he was recuperating from surgery to a torn rotator cuff.

223.   Nestor, Ingvar Kaasler and Lisa Barona, Plaintiff's co-workers, also routinely worked from home.

224.   Plaintiff and her co-workers could easily perform most aspects of their work from home as they all enjoyed access to CBS's systems and files via its "VPN" remote computer access.

225.   Plaintiff requested on many occasions permission to work from home but was denied.

23

226.    By letter, dated February 11, 2008, UNUM advised Plaintiff that she was no longer entitled to receive STD benefits under CBS's plan because her employment was terminated on January 18, 2008.

227.    In that letter UNUM stated that Plaintiff's discharge did not prevent her from applying for LTD benefits under the plan but only after a 26 week delay, or "elimination period."

228.    Upon receipt of this February 11 letter, Plaintiff telephoned Kelley Libby, UNUM's Disability Benefits Specialist, and the author of the February 11 letter, and asked her how to go about appealing the decision to deny her STD benefits.

229.    Plaintiff advised Ms. Libby that UNUM had approved her for an additional 26 weeks of STD benefits under CBS's plan given that she had been on leave since January 7, 2008 for a shoulder injury that was new and unrelated to her previous disabilities.

230.    Ms. Libby agreed that Plaintiff was now on leave for a new and unrelated disability but said that CBS employs UNUM and that "we have to go by what CBS does."

231.    Ms. Libby also advised Plaintiff that she could not appeal the decision to deny her STD benefits because CBS was no longer paying for her benefits as she was no longer a CBS employee.

232.    Based on Ms. Libby's advice, Plaintiff did not appeal the denial of her STD benefits.

233.    Either during this conversation, or on another occasion, Plaintiff told Ms. Libby that she wanted to apply for LTD benefits under CBS's plan given that she was no longer entitled to STD benefits.

234.    Ms. Libby responded that under CBS's plan, Plaintiff was not eligible at that time for LTD benefits as she was now on leave for a new and unrelated disability and that she had to wait for an 26-week elimination period; if Plaintiff remained disabled with the same condition after that 26 week period, then only then would she be eligible to receive LTD benefits.

24

235.   Due to Defendants' actions, Plaintiff was denied benefits owed to her under CBS's ERISA-plans.

236.   Plaintiff was subsequently approved for New York State short term disability benefits and received a mere $156 every two weeks starting from December 21, 2007, far less than she would have received under CBS's STD and LTD plans.

237.   Furthermore, lacking medical insurance coverage Plaintiff was forced to pay for certain medical costs out of pocket for her ongoing treatment and surgical procedures and at a premium rate.

238.   Had CBS not unlawfully terminated Plaintiff, these medical costs would have been reimbursed under Plaintiff's medical plan.

239.   In order to pay for these mounting and prohibitive costs, Plaintiff was also forced to cash out her 401K pension fund and had to pay a large penalty to do so.

240.   Defendants violated ERISA by unlawfully terminating Plaintiff's employment, at least in part, to prevent her from receiving STD disability benefits that Plaintiff was entitled to.

241.   Plaintiff is entitled to recover damages for benefits owed to her under the law.

242.   Plaintiff has requested that Defendants send her a copy of the CBS and UNUM policy documents and summary plan descriptions on various occasions but to date, Defendants have failed to provide all or any part of such documents.

243.   Pursuant to ERISA, CBS was obligated to mail a copy of the CBS and UNUM policy documents and summary plan descriptions to Plaintiff within 30 days of her request and their failure to do so make them further liable to Plaintiff.

244.   By letter, dated April 21, 2009, Plaintiff's attorneys requested in writing from Louis J. Briskman, Esq., CBS's Executive Vice President and General Counsel, copies of CBS's "summary plan descriptions of all pertinent employee benefit plans, including the disability benefits plan" and

the identity of the "respective plan administrators."

245.    To date, and upon information and belief, CBS has failed to provide either the requested summary plan descriptions or identified the plan administrators in response to the April 21, 2009 letter.

246.    For the reasons stated above, Mrs. Tropp's termination was retaliatory and in response to the sum of Plaintiff's protected activity, including her October 9, 2007 written complaint of discrimination and her October 18, 2007 complaints in person to Kalarchian and Baez.

247.    Each retaliatory adverse action closely followed Plaintiff's various written complaints of discrimination and harassment with Defendants' HR Department and via CBS's Openline complaints mechanism against her supervisor and Baez.

248.    At all relevant times, and when cleared by her physicians to return to work, Mrs. Tropp was able to perform the essential functions of her job with certain reasonable accommodations.

249.    Defendants did not suffer undue business hardship because of Mrs. Tropp's disabilities nor would they have suffered hardship by providing her with the reasonable accommodations requested by Plaintiff and her doctors and allowed her to take disability leave.

250.    Defendants discriminated against Plaintiff, subjected her to a hostile work environment and, ultimately, terminated Plaintiff's employment because of her disabilities, her record of disability or her perceived disabilities and because she availed herself of FMLA-protected leaves.

251.    Defendants Nestor, Baez and Kalarchian individually took many of the adverse actions against Plaintiff alleged herein including making the decision to terminate Plaintiff's employment.

252.    Defendants Nestor, Baez and Kalarchian also aided, abetted, condoned, assisted, and/or encouraged CBS's and each others discriminatory acts.

253.    Defendants committed, were aware of, authorized and/or condoned the discriminatory and

26

unlawful behavior against Plaintiff.

254.    Defendants actions constitute a continuing policy and practice of discrimination.

255.    Defendants' actions have caused Plaintiff and her family enormous financial hardship and emotional distress.

256.    Defendants' unlawful conduct was intentional and carried out with oppression, malice, and/or a reckless or conscious indifference to Mrs. Tropp's protected rights, and therefore Plaintiff is entitled to punitive damages.

257.    Despite diligent and ongoing efforts, Mrs. Tropp has been unable to secure alternative employment.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION: ERISA

258.    The allegations in the preceding paragraphs are repeated here as if fully stated.

259.    Defendants maintained a disability benefits plan as defined at 29 U.S.C. § 1002(2)(A) of ERISA, Defendants were the plan sponsors of this plan and Plaintiff had vested benefits under this ERISA-covered employee benefit plan.

260.    In January, 2008, Defendants insurers under their disability benefits plan approved Plaintiff to receive STD benefits under the plan based on medical documentation submitted at the time.

261.    Defendants violated ERISA by intentionally preventing Plaintiff from receiving short term disability benefits by unlawfully terminating her employment.

262.    Defendants thus violated Section 510 of ERISA, 29 U.S.C. §1140 by terminating Plaintiff's employment in order to interfere with her protected rights under ERISA.

263.    Defendants violated Section 510 of ERISA, 29 U.S.C. §1133 by failing to provide Plaintiff with a copy of the CBS and UNUM policy documents and summary plan descriptions.

264.    Defendants violated Section 510 of ERISA, 29 U.S.C. §1133 by failing to provide adequate notice in writing to Plaintiff when her claim for benefits under the plan were denied, failure to set forth the specific reasons for such denial, and failure to write to Plaintiff in a manner calculated to be understood by her.

265.    Plaintiff is thus entitled to recover damages for benefits owed to her pursuant to Section 502(a)(1) of ERISA, 29 U.S.C. § 1132.

266.    Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $500,000.

### SECOND CAUSE OF ACTION: FMLA

267.    The allegations in the preceding paragraphs are repeated here as if fully stated.

268.    Plaintiff is an eligible employee as that term is understood within the FMLA.

269.    Defendants intentionally violated the FMLA by interfering with, restraining and/or denying Plaintiff's attempts to exercise her rights under the FMLA.

270.    Defendants willfully retaliated against Plaintiff for exercising her rights protected under the FMLA and she suffered adverse employment actions for availing herself of FMLA-protected leaves during her employment with Defendants.

271.    Defendants willfully and intentionally violated the FMLA.

272.    Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $1,000,000.

### THIRD CAUSE OF ACTION: SHRL (DISABILITY DISCRIMINATION)

273.    The allegations in the preceding paragraphs are repeated here as if fully stated.

28

274.    Defendants intentionally discriminated against Plaintiff and created a hostile work environment on the basis of her disabilities, a record of such disabilities and/or perceived disabilities in violation of the SHRL.

275.    Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $1,000,000.

### FOURTH CAUSE OF ACTION: SHRL (RETALIATION)

276.    The allegations in the preceding paragraphs are repeated here as if fully stated.

277.    Defendants intentionally retaliated against Plaintiff for the sum of her protected activity, which included filing formal complaints of disability discrimination, harassment and hostile work environment with Defendants' HR Department and with her managers.

278.    Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $1,000,000.

### FIFTH CAUSE OF ACTION: CHRL (DISABILITY DISCRIMINATION)

279.    The allegations in the preceding paragraphs are repeated here as if fully stated.

280.    Defendants intentionally discriminated against Plaintiff and created a hostile work environment on the basis of her disabilities, a record of such disabilities and/or perceived disabilities in violation of the CHRL.

281.    Defendants Nestor, Baez and Kalarchian personally directed the discriminatory conduct and also aided in and abetted the discrimination and harassment.

282.    Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $1,000,000.

## SIXTH CAUSE OF ACTION: CHRL (RETALIATION)

283.   The allegations in the preceding paragraphs are repeated here as if fully stated.

284.   Defendants intentionally retaliated against Plaintiff for the sum of her protected activity, which included filing formal complaints of disability discrimination, harassment and hostile work environment with Defendants' HR Department and with her managers.

285.   Defendants Nestor, Baez and Kalarchian personally directed the retaliatory conduct and also aided in and abetted the retaliation suffered by Plaintiff.

286.   Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $1,000,000.

## DEMAND FOR TRIAL BY JURY

Pursuant to applicable state law, Plaintiffs demand a trial by jury in this action.

WHEREFORE, Plaintiff demands that judgment be granted as follows:

A. The amount sought for each cause of action;

B. Liquidated damages;

C. Punitive damages; and

D. Attorneys fees and costs.

Dated:          New York, New York
                January 19, 2010

                               **LAW OFFICES OF IAN WALLACE, PLLC**

                By:    _____
                       IAN WALLACE (IW: 3100)
                       ANNE DONNELLY-BUSH (AD: 5486)
                       *Attorneys for Plaintiff*
                       501 Fifth Avenue, 19th Floor
                       New York, N.Y. 10017
                       Tel.: (212) 661-5306

31